IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

22  11:29

**WHITE BUFFALO VENTURES, LLC,**
**Plaintiff,**

-vs-

**Case No.  A-03-CA-296-SS**

**THE UNIVERSITY OF TEXAS AT AUSTIN,**
**Defendant.**

## O R D E R

BE IT REMEMBERED on the 9th day of March 2004 the Court called the above-styled cause for a hearing on all pending matters and the parties appeared through counsel.  Before the Court were the Plaintiff's [#38] and Defendant's [#41] cross-motions for summary judgment and their respective responses thereto [#44, #45] as well as Plaintiff's Motion for Oral Argument of Its Motion for Summary Judgment [#46].  After the hearing each party filed a reply [#48, #49].  Having considered the summary judgment motions, responses, replies, relevant law, and the case file as a whole, the Court now enters the following opinion and orders.

### Background

This is a case about unsolicited commercial email, commonly known as "spam." *See* S. Rep. No. 108-102, at 2 (2003), *reprinted in* 2004 U.S.C.C.A.N. 2348 (defining "spam" as unsolicited commercial email).[1]  The plaintiff in this lawsuit, White Buffalo Ventures, L.L.C. ("White Buffalo"),

---

[1]The same Senate Report recounts the origin of the term "spam," explaining "'[i]t all started in early Internet chat rooms and interactive fantasy games where someone repeating the same sentence of comment was said to be making a 'spam'.  The term referred to a Monty Python's Flying Circus scene in which actors keep saying 'Spam, Spam, Spam, and Spam' when reading options from a menu.'"  S. Rep. No. 108-102, at n.1 (quoting April 5, 1999 edition of *Computerworld*).



50

CTS

operates several online dating services, including LonghornSingles.com.  In April of 2003, White

Buffalo obtained a list of email addresses from University of Texas at Austin ("UT") pursuant to a

request under the Texas Public Information Act.  Shortly thereafter, White Buffalo sent

approximately 55,000 unsolicited emails promoting LonghornSingles.com to members of the UT

community with email addresses ending in "utexas.edu."  Messages sent to email addresses ending

in utexas.edu are stored on computer servers owned and operated by UT.  UT has developed alarms

and utilizes commercial spam filters that alert network systems operators when a large amount of

email is coming from one source.  White Buffalo's spam did not trigger an alarm and was not

detected by UT filters. However, after UT officials received a number of complaints regarding the

LonghornSingles.com spam, UT notified White Buffalo and asked the company to stop spamming

utexas.edu addresses.  White Buffalo declined to do so and therefore UT added a filter for all

inbound traffic from IP address 207.195.226.25 on the UT network board router, thereby blocking

any more email from LonghornSingles.com's IP address from reaching any of the 150 plus email

severs on the UT campus.[2]  *See* Def.'s Mot. for Summ. J. Ex. A ("Updegrove Decl.") ¶ 4.

UT has a general anti-solicitation policy pursuant to which UT prohibits solicitation at and

on UT facilities subject to certain exceptions.  *See* Def.'s Mot. for Summ. J. Ex. A-1 (UT Bd. of

Reagents' Rules & Regs., Pt. One, Ch. VI, "Student Services and Activities and Regulations on

Facilities Use"); Updegrove Decl. ¶ 1.  Pursuant to the Board of Reagent's Rules and Regulations

regarding solicitation, UT Information Technology Services ("ITS") promulgated specific policies

to curb spam targeted at UT community members.  *See* Def.'s Mot. for Summ. J. Ex. A-2 ("UT ITS

---

[2]Apparently, at one time UT was also blocking UT users' ability to access the
LonghornSingles.com website from the UT network, but at the hearing the parties informed the
Court this is no longer the case.

Anti-Spam Notices and Procedures") (stating the "online directory service is provided by the University to facilitate the research, teaching, learning, and service missions of the University Community" and because "[s]olicitation on computing and network resources if prohibited by the Rules and Regulations of the [UT] Board of Reagents . . . the contact information provided in this online directory service may not be used for transmission and distribution of unsolicited e-mail or other commercial purposes."); Updegrove Decl. ¶ 2. According to the anti-solicitation rules and anti-spam policy, UT takes steps to block or stop the transmission of unsolicited commercial email whenever such email is detected, whether by the system alarms or filters or by UT system user complaints. Updegrove Decl. ¶ 2. In addition to blocking the LonghornSingles.com IP address, UT has blocked more than 1000 email senders for failing to comply with UT's anti-spam policy and anti-solicitation rules. Updegrove Decl. ¶ 5. UT's evidence demonstrates it did not block LonghornSingles.com spam because of the service it promoted (online dating), it blocked the spam because it was spam – that is, unsolicited commercial email. Updegrove Decl. ¶ 5.

White Buffalo has sued the University of Texas at Austin ("UT") seeking to enjoin UT from blocking its mass commercial emails to UT students, faculty and staff. White Buffalo contends this Court should enjoin UT from blocking its spam because in blocking the LongHornSingles.com spam, UT has violated White Buffalo's free speech rights under the First Amendment and equal protection rights under the Fourteenth Amendment. Additionally, White Buffalo contends UT's anti-spam policy is preempted by the recently enacted federal law known as the Controlling the Assault of Non-Solicited Pornography and Marketings Act of 2003 (hereinafter, "the CAN-SPAM Act"), 15 U.S.C. § 7701 et seq.[3]

---

[3]In addition to requesting injunctive relief and asserting the aforementioned constitutional and preemption claims, White Buffalo originally pled a tortious interference with contract claim

## Analysis

**A.    Summary Judgment Standard**

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). In deciding summary judgment, the Court should "construe all facts and inferences in the light most favorable to the nonmoving party." *Hart v. O'Brien*, 127 F.3d 424, 435 (5th Cir. 1997), *cert. denied*, 525 U.S. 1103 (1999). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Both parties bear burdens of producing evidence in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). First, "[t]he moving party must show that, if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Hart*, 127 F.3d at 435 (citing *Celotex*, 477 U.S. at 327). The nonmoving party must then "set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings." *Id.* (citing FED. R.

---

against UT. UT moved for summary judgment on this claim on the grounds on the basis of its sovereign immunity from tort claims under Texas law. White Buffalo did not respond to UT's motion on this point and does not address its tort claim in its own motion for summary judgment and thus, apparently abandons the claim. Regardless, UT is entitled to summary judgment on the tortious interference with contract claim because it is immune. *See, e.g., University of Texas – Pan American v. De Los Santos*, 997 S.W.2d 817, 821 (Tex. App. – Corpus Christi 1999, no pet.) (holding university immune from state law tortious interference with contract claims).

CIV. P. 56(e); *Anderson*, 477 U.S. at 249).   However, "[n]either 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

**B.      CAN-SPAM Act of 2003's Preemptive Effect**

Last year, Congress enacted the CAN-SPAM Act, which took effect on January 1, 2004.  15 U.S.C. § 7701 (quoting 2003 Act. Pub. L. 108-187, § 16, Dec. 16, 2003, 117 Stat. 2719 in notes after § 7701).  The purposes of the CAN-SPAM legislation are: (1) to prohibit spammers from deceiving email recipients and Internet Service Providers (ISPs) regarding the source or subject of the unsolicited commercial email messages; (2) to require spammers to give spam recipients an opportunity to decline to receive further emails from them and to honor the recipients' requests; (3) to require spammers include their valid physical address in their  spam message and notice the message is an advertisement or solicitation; and to prohibit businesses from permitting the promotion of their business through false or misleading spam.  S. Rep. 108-102 at 1.  To that end, the CAN-SPAM Act prohibits spammers from sending deceptive or misleading information and using deceptive subject hearings, requires them to include return addresses in their email messages, and prohibits them from sending emails to a recipient after that recipient has indicated they do not wish to receive email messages from them. 15 U.S.C. § 7704(a). White Buffalo contends and UT does not dispute the mass commercial email messages White Buffalo sent and intends to send to UT comply with the CAN-SPAM Act and are therefore not illegal under the statute.  But White Buffalo and UT disagree about the significance of the spam's compliance with the CAN-SPAM Act:  White Buffalo maintains the Act preempts any state attempt to further regulate unsolicited electronic mail including UT's anti-spam policy, whereas UT contends even if White Buffalo's spam is not prohibited by the

CAN-SPAM Act, nothing in the Act prevents the university from filtering or blocking White Buffalo spam or any other spam.

White Buffalo bases its argument on the text of the CAN-SPAM Act itself, which specifically states it "supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent any such statute, regulation, or rules prohibits falsity or deception in any portion of a commercial mail message or information attached thereto." 15 U.S.C. § 7707(b)(1). White Buffalo argues this preemption language means UT cannot place any further limitations on unsolicited commercial email beyond those outlined in the CAN-SPAM Act. It is true Congress recognized email communication is inherently interstate in nature. *See* S. Rep. 108-102, at 21. Accordingly, Congress explicitly noted the ineffectiveness of piecemeal, state-by-state regulation of unsolicited commercial email and the burden it imposes on legitimate businesses that advertise through email to attempt to comply with various state laws when they most likely are unsure of the state of destination of many of the emails they send. *See* 15 U.S.C. § 7701(a)(11). As such, Congress explicitly noted "there is a substantial government interest in regulation of commercial electronic mail on a nationwide basis." 15 U.S.C. § 7701(b)(1).

However, Congress also recognized the limitations of the CAN-SPAM Act, which White Buffalo's interpretation of the statute ignores. Specifically, Congress stated "the problems associated with the rapid growth and abuse of unsolicited commercial email cannot be solved by Federal legislation alone" and therefore, the "development and adoption of technological approaches . . . will be necessary as well." 15 U.S.C. § 7701(a)(12). Additionally, within the section of the statute addressing preemption, the Act clarifies it does not preempt the applicability of "State laws not

specific to electronic mail, including State trespass, contract, or tort law" or States laws regulating fraud or computer crime. 15 U.S.C. § 7707(b)(2). The statute further clarifies the CAN-SPAM Act should not be "construed to have any effect on the lawfulness or unlawfulness, under any other provision of law, of the adoption, implementation, or enforcement by a provider of Internet access service of a policy of declining to transmit, route, relay, handle, or store certain types of electronic mail messages." 15 U.S.C. § 7707(c).

Each of these parts of the CAN-SPAM Act are relevant to this case. First of all, the Board of Reagents Rules governing solicitation using university facilities cannot be said to be specific to electronic mail since it regulates all forms of solicitation. *See* Def.'s Mot. for Summ. J. Ex. A-1 (UT Bd. of Reagents' Rules & Regs., Pt. One, Ch. VI, "Student Services and Activities and Regulations on Facilities Use"); *cf., e.g.*, TEX. BUS. & COM. CODE §§ 46.001-46.011 (explicitly regulating unsolicited commercial email). Furthermore, even though the UT ITS anti-spam policy obviously relates to commercial electronic mail, it is not clear an ITS policy is a "statute, regulation, or rule of a State or political subdivision of a State" and therefore preempted § 7707(b)(1). Even if were, however, UT is certainly a provider of Internet access service to its students, if not to its employees and faculty, and as such, is expressly authorized under the statute to implement policies declining to transmit, route, relay, handle or store spam. 15 U.S.C. § 7707(c).

In enacting the CAN-SPAM Act, Congress not only recognized the burdens imposed upon computer networks of employers and universities by deceptive and illegal spam, Congress also recognized the burden imposed by the overwhelming volume of all spam (legitimate and illegitimate) being transmitted over the Internet. *See* S. Rep. 108-102, at 3 (noting "the sheer volume of spam is threatening to overwhelm not only the average consumer's in-box, but also the network systems of

ISPs, businesses, universities, and other organizations."). As such, the Court cannot believe Congress intended this Act to prevent universities or local and state government agencies from blocking or filtering unsolicited commercial email. In contrast, if White Buffalo were prosecuted under the Texas anti-spam statute, TEX. BUS. & COM. CODE §§ 46.001-46.011, White Buffalo would surely be able to raise preemption as a defense and the state would be prevented from imposing penalties on White Buffalo if their spam complied with all provision of the CAN-SPAM Act.[4] The Act, however, does not preclude a state entity like UT from using technological devices like spam-filters to conserve server space and safeguard the time and resources of its employees, students, and faculty. *See* 15 U.S.C. § 7701(a)(12) (recognizing the needs to develop and adopt technology to combat the negative aspects of spam the federal legislation cannot address).

**C.    Commercial Speech and *Central Hudson***

In addition to arguing UT's policies are preempted, White Buffalo argues UT is violating its rights under the First Amendment by blocking its spam to utexas.edu email addresses. Neither party disputes the unsolicited email White Buffalo sent promoting LonghornSingles.com constitutes commercial speech, which the Supreme Court has defined as "expression related solely to the economic interests of the speaker and its audience." *Commercial Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 562 (1980). The First Amendment protects commercial speech, albeit to a lesser degree than other constitutionally guaranteed expression such as a political speech. *Id.* at 562-63. In *Central Hudson*, the Supreme Court articulated the now-familiar four part

---

[4]The State of Texas, however, is empowered to bring a civil action on behalf of the residents of a state against spammers that violate the provisions of the CAN-SPAM Act. *See* 15 U.S.C. § 7706(f). Additionally, ISPs can bring actions against spammers that violate the Act to enjoin their violations and for the money damages they incur due to the spammers' illegal behavior. *See* 15 U.S.C. § 7706(g).

test for evaluating the constitutionality of a content-neutral regulation of commercial speech: First, the court must determine whether the speech is lawful and not misleading, otherwise it is outside the First Amendment's protection. *Id.* at 566. If the speech is neither misleading or unlawful, then the court must ascertain whether the government has asserted a substantial interest. *Id.* If the government has asserted a substantial interest, then a court must evaluate whether the regulation directly advances the asserted governmental interest and whether it is more extensive than necessary to serve that interest. *Id.*

UT's anti-solicitation and anti-spam policies easily survive a constitutional challenge under *Central Hudson.* No one disputes White Buffalo's spam was neither misleading nor unlawful. But UT has asserted a substantial government interest – namely, managing and blocking the unsolicited commercial email the university computer system receives that ties up memory space on UT servers, expends UT resources in responding to user complaints, and disrupts the work of UT students, faculty and staff. As Congress documented in the legislative history of the CAN-SPAM Act, the volume of spam has been increasing rapidly and as of 2003, accounted for more than 46% of all global email traffic. S. Rep. 108-102, at 2. Congress cited a *USA Today* report anticipating more than two trillion spam messages would be sent over the Internet in 2003. *Id.* at 3. And Congress specifically recognized that "the sheer volume of spam is threatening to overwhelm not only the average consumer's in-box, but also the network systems of ISPs, businesses, *universities*, and other organizations." *Id.* at 3 (emphasis added). As a consequence, large ISPs like America Online, Microsoft and Earthlink block billions of incoming spam messages a day. *Id.* Congress also recounted spam's economic impact on ISPs, consumers and the workplace:

> Spam imposes significant economic burdens on ISPs, consumers, and businesses. Left unchecked at its present rate of increase, spam may soon undermine

the usefulness and efficiency of e-mail as a communications tool. Massive volumes of spam can clog a computer network, slowing Internet service for those who share that network. ISPs must respond to rising volumes of spam by investing in new equipment to increase capacity and customer service personnel to deal with increased subscriber complaints. ISPs also face high costs maintaining e-mail filtering systems and other anti-spam technology on their networks to reduce the deluge of spam. Increasingly, ISPs are also undertaking extensive investigative and legal efforts to track down and prosecute those who send the most spam, in some cases spending over a million dollars to find and sue a single, heavy-volume spammer.

Though major service providers tend to disagree about the overall monetary impact spam has had on their respective networks, anti-spam initiatives cost providers time and money, and those expenses typically have been passed on as increased charges to consumers. A 2001 European Union study found that spam cost Internet subscribers worldwide $9.4 billion each year, and USA Today reported in April that research organizations estimate that fighting spam adds an average of $2 per month to an individual's Internet bill. Additionally, some observers expect that free e-mail services (often used by students and employees who obtain free Internet access) will be downsized as the costs of spam increase, which may result in consumers facing significant "switching costs" as they are forced to migrate to subscription-based services. As reported by the Boston Globe, industry analysts are concerned that this trend could influence millions of consumers to abandon the use of e-mail messaging as a viable means of communication.

*       *       *

In addition to the costs to ISPs and consumers, recent industry research has focused on the impact of spam's growth on businesses and e-commerce. Ferris Research currently estimates that costs to United States businesses from spam in lost productivity, network system upgrades, unrecoverable data, and increased personnel costs, combined, will top $10 billion in 2003. Of that total, Ferris estimates that employee productivity losses from sifting through and deleting spam accounts for nearly $4 billion alone. Recent press reports also indicate that large companies with corporate networks typically spend between $1 to $2 per user each month to prevent spam, which is currently estimated to make up 24 percent of such corporations' inbound e-mail. At current growth rates, however, spam could account for nearly 50 percent of all inbound e-mail to large corporations by 2004. Ferris reports that corporate costs of fighting spam today represent a 300 percent increase from 2 years ago, and the Yankee Group estimates that costs to corporations could reach $12 billion globally within the next 18 months. Based on current spam growth rates, the Radicati Group estimates that, on a worldwide basis, spam could cost corporations over $113 billion by 2007.

*Id.* at 6-7.   UT, like the corporations mentioned in this excerpt, also has an interest in safeguarding

the time and productivity of its employees and students by limiting the amount of unsolicited bulk

mailings to which they are subjected.  State universities have a substantial interest in protecting their networks and servers from the ever-increasing deluge of spam and therefore, UT has asserted a substantial government interest.

While UT's system for stopping spam, which involves commercial filters, responding to user complaints, and installing ISP-specific filters, could not be considered perfectly tailored in that it most likely blocks some solicited email and misses some spam, it is sufficiently tailored in light of the quantity of users and spam with which it deals and in light of the technology currently available.  As such, UT's policies do not run afoul of *Central Hudson* and the Court will not enjoin UT from blocking White Buffalo's email messages to utexas.edu since White Buffalo will not commit to stop spamming utexas.edu addresses.[5]

**D.      Public or Non-Public Forum**

UT, citing *Perry Education Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37 (1983), also argues its information technology network constitutes a non-public forum and thus UT can impose more stringent limitations on speech than it would be able to under *Central Hudson*.  In *Perry*, the Supreme Court held a public school system's internal mail system did not constitute a state-created public forum and therefore the school board could reserve the forum for its intended purposes, communicative or otherwise, as long as it did not discriminate on the basis of viewpoint and the

---

[5]White Buffalo argues UT is effectively cutting off the company's correspondence with its customers since emails to customers with utexas.edu addresses are blocked, even if White Buffalo is responding to that customer's email.  However, the customers can communicate with White Buffalo through other email accounts, including free services such as Microsoft Hotmail or Yahoo. Moreover, UT would permit correspondence from the White Buffalo IP address to utexas.edu addresses if White Buffalo would promise to stop spamming UT – that is, promise to stop sending tens of thousands of unsolicited email messages promoting LonghornSingles.com at a time to the university community.

limitations it imposed were reasonable in light of the purpose served by the forum. The Supreme Court concluded the *Perry* mail system was established to transmit official messages and facilitate communication between teachers and school administration. *Id.* at 39. The fact that teachers could use the system for personal mail and could receive some messages from private organizations did not render the system a non-public forum because there had never been any indication the mail system was open to use by the general public. *Id.* at 47. UT contends *Perry* controls in this case because a its information technology network is primarily designed to further interests of the university and to facilitate communication between university community members. *See* UT ITS Anti-Spam Notices and Procedures (stating the "online directory service is provided by the University to facilitate the research, teaching, learning, and service missions of the University Community"). According to UT, the fact its network users can send and receive email to those outside the system does not render the network public, just as the teacher's use of the mail system for some private correspondence did not render the internal mail system in *Perry* private. UT emphasizes it does not offer email accounts to members of the general public, it only offers them to students and employees of the university. Updegrove Decl. ¶ 7.

There is some authority for the proposition that a state university's email system, even a large state university's, is a non-public forum. *See Loving v. Boren*, 956 F. Supp. 953 (W.D. Okla. 1997) (holding the University of Oklahoma computer and Internet services do not constitute a public forum because they are lawfully dedicated to academic and research uses and the state has as much of a right as a private owner of property to preserve its property for the use for which it was dedicated), *aff'd on alternate grounds*, 133 F.3d 771 (10th Cir. 1998). However, because the Court has upheld the validity of UT's non-solicitation rules and anti-spam policy under the *Central Hudson* test, which is

that test that applies even assuming UT's network is a public forum, it is unnecessary for the Court to decide the question of whether UT's network constitutes a non-public forum.

**E.      Equal Protection Claim**

Finally, White Buffalo maintains UT violated its rights under the Equal Protection Clause of the Fourteenth Amendment by blocking LonghornSingles.com email traffic because UT does not block all unsolicited commercial email. White Buffalo does not contend UT blocked its email because it (or those who run it) is a member of a suspect class or because it invoked a constitutional right. Therefore, in order to state a claim that its rights under the Equal Protection Clause were violated, White Buffalo must allege it was treated differently from others who were similar situated without any rational basis for the differential treatment. *Wheeler v. Miller,* 168 F.3d 241, 252 (5th Cir. 1999); *see also Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000) (clarifying that equal protection claims can be brought by a "class of one" without allegation of race or other class-based animus "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."). However, as the Court discussed above, UT's policy is to block all incoming spam of which it is aware. Admittedly, it does not block all spam due to imperfections in its systems of detection but it has a policy to block all spam brought to its attention. As such, there is a rational basis for any alleged differential treatment between White Buffalo and any spammer who has thus far gone undetected.

In accordance with the foregoing:

IT IS ORDERED that Plaintiff's Motion for Summary Judgment [#38] is DENIED and Defendant's Motion for Summary Judgment [#44] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Oral Argument of Its Motion for Summary Judgment [#46] is DISMISSED AS MOOT in light of the oral argument held by this Court on March 9, 2004.

SIGNED this the _22ⁿᵈ_ day of March 2004.

_Sam Sparks_
SAM SPARKS
UNITED STATES DISTRICT JUDGE

-14-